**UNITED STATES of America, Appellee,**

v.

**James William GRUBBS, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Charles Shepard WITHEY,
III, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Norman Lee LOTTERER, Appellant.**

**Nos. 84–5230(L), 84–5236 and 84–5238.**

United States Court of Appeals,
Fourth Circuit.

Argued May 10, 1985.
Decided Sept. 27, 1985.

J. Kevin Holmes, David Pearlman, Charleston, S.C., Michael Cox, Asst. Federal Public Defender, Columbia, S.C., David McCann, Charleston, S.C. (David A. Hoines, Fort Lauderdale, Fla., Steinberg, Levkoff, Spitz &. Goldberg, Charleston, S.C., on brief), for appellant.

Dale L. DuTremble, Asst. U.S. Atty., Charleston, S.C. (Henry Dargan McMaster, U.S. Atty., Columbia, S.C., on brief), for appellee.

Before CHAPMAN and WILKINSON, Circuit Judges, and TURK, Chief United States District Judge for the Western District of Virginia, sitting by designation.

WILKINSON, Circuit Judge:

Appellants Norman Lee Lotterer, Charles Shepard Withey, III, and James William Grubbs were each convicted of four offenses following a jury trial: (1) conspiracy to import marijuana, in violation of 21 U.S.C. § 963; (2) conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. §§ 952(a), 960 and 18 U.S.C. § 2; and (4) possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(6) and 18 U.S.C. § 2. Finding no error, we affirm.

Appellants dispute both their knowledge of marijuana on board their vessel and their intent to distribute that cargo. We hold that clever concealment of illegal substances will not preclude a finding that defendants knew of their cargo when circumstances surrounding the incident suggest their awareness of illegal activity. Moreover, a finding that co-conspirators intend to distribute their cargo is permissible where they have imported a large quantity of a valuable, illegal substance without plans to turn it over to others for distribution.

I

Appellants were arrested on November 24, 1983 after 86 bales of marijuana, weighing approximately 3000 pounds, were discovered in two void areas of a vessel manned by appellants, the *Maxima*. At the time of its seizure, the *Maxima* was off the coast of Charleston, South Carolina. The 60-foot vessel is registered in the Turks and Caicos Islands and owned by a corporation of the Islands, the World Wide Salvage Company.

Appellant Lotterer had the longest association with the vessel, from at least October, 1982, when he was hired by World Wide Salvage. Receipts entered into evidence show that World Wide Salvage purchased lumber, rubber fuel bladders, and carpet in the spring of 1983. Lotterer personally acknowledged receipt of the carpet, purchased by his girlfriend. Grubbs joined Lotterer in July, 1983 in Puerto Rico, where the *Maxima* received extensive repairs at the Isletta Marina. A repair bill of $2,821.-17 was submitted to Lotterer, with both Lotterer's and Grubbs' name on attached receipts.

Appellant Withey joined the crew of the *Maxima* during the last week of October, 1983, when the vessel sailed from St. Thomas to the U.S. Naval Base in Guantanamo Bay, Cuba to retrieve items lost by the *Maxima* when rescued by the Coast Guard in heavy seas in August, 1982. The

vessel returned to St. Thomas, where it remained until November 17, 1983. On that date it left for Charleston, South Carolina with the three appellants on board. Appellant Withey was apparently a replacement for Lotterer's girlfriend, who was unable to make the trip.

On November 24, 1983, at approximately 3:30 a.m., the Coast Guard cutter *Cape Knox* made radar contact with the *Maxima* nine miles off the South Carolina coast. About 500 yards from the *Maxima*, the *Cape Knox* beamed its search lights, and requested information from the *Maxima* crew. Lotterer correctly gave his identity, the name of the vessel and its last port of call. He stated that the *Maxima* was sailing to Charleston for repair work. No other vessel was in the vicinity.

Five members of the Coast Guard boarded the *Maxima* at 4:49 a.m. and searched the vessel for approximately 30 minutes. They found no evidence of contraband, but did notice a mismatched piece of paneling in the galley area. After keeping the *Maxima* under radar surveillance, the *Cape Knox* crew boarded the *Maxima* a second time at 10:30 a.m. and conducted a three hour non-destructive search for contraband. At the end of this boarding, a measurement of the vessel disclosed a six-foot discrepancy, later identified as two three-foot void areas, one behind the mess deck bulkhead and the other in front of the berthing area bulkhead. The *Cape Knox* towed the *Maxima* to the U.S. Coast Guard Base in Charleston.

At the base, 86 bales of marijuana, worth approximately 1½ million dollars, were discovered in the void areas. A Jamaican dollar bill was attached to each bale of the high-grade Jamaican sensimilla marijuana. The void areas were constructed of plywood and covered with other lumber. The berthing area void contained two rubber fuel bladders filled with diesel fuel on which the bales rested, apparently in an attempt to mask the odor of the contents. The berthing area bulkhead was carpeted.

A navigation chart seized from the wheelhouse showed a course leading to St. Helena Sound, approximately 35–45 miles

south of Charleston, the crew's stated destination. Also seized were various papers, documents, receipts and written materials, along with the vessel's radios. Among these items was a November 1983 copy of *High Times*, described in testimony by a Drug Enforcement Agency agent as a magazine "geared toward the drug cult." A centerfold and a major article in the issue featured sensimilla, and a chart in the magazine showed the current street value of Jamaican sensimilla.

## II

■ Lotterer, Withey and Grubbs contend chiefly that the evidence was insufficient to sustain their convictions. In reviewing a jury verdict on appeal we must examine the evidence in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Jones*, 735 F.2d 785, 790 (4th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 297, 83 L.Ed.2d 232, *cert. denied sub nom. Neil v. United States*, — U.S. —, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984). A decision to overturn a jury verdict for want of substantial evidence must be "confined to cases where the prosecution's failure is clear." *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Viewing the matters in this light, we believe that the jury had before it sufficient evidence to convict all defendants on all counts.

### A.

■ Appellants contend they had no knowledge that the well-hidden marijuana was aboard the *Maxima*. Knowledge is, of course, an essential element of the crimes for which appellants were convicted. *United States v. Bodden*, 736 F.2d 142, 145 (4th Cir.1984). It may be shown by circumstantial evidence. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469.

In *United States v. Alfrey*, 620 F.2d 551 (5th Cir.), *cert. denied*, 449 U.S. 938, 101 S.Ct. 337, 66 L.Ed.2d 160 (1980), the Fifth Circuit allowed knowledge and participation in an importation conspiracy to be

inferred from a combination of three factors: the probable length of the voyage, the large quantity of marijuana, and the close relationship of those on board. *Id.* at 556. Here, the *Alfrey* factors are present in abundance: the voyage lasted one week, 1½ tons of marijuana were on board, and appellants had prior relationships that included at least one other voyage together and previous business association. Moreover, the small size of the crew aboard the *Maxima* necessitated close contact.

Whether the *Alfrey* factors alone would support a conviction depends simply on the strength of the inferences to be drawn from their existence in each case. We need not rely solely on the *Alfrey* factors where other evidence is present. In *Bodden,* the court found additional factors—the visibility and odor of the contraband and the fact that the boat rode low in the water—sufficient to sustain the conviction. Here, as in *Bodden,* we find other evidence from which the necessary elements of the crimes can be inferred.

■ Appellant Lotterer was on the *Maxima* both before and after its voyage to Isletta Marina. Prior to the voyage, the evidence suggests, he had purchased lumber, carpet, and rubber fuel bladders. All of these items were part of the void areas in which the marijuana was discovered. Grubbs joined Lotterer in Puerto Rico, and both of their names appeared on receipts from the marina during that period when the *Maxima* was undergoing extensive repairs. A permissible inference is that Grubbs and Lotterer used the available materials to construct the void areas during or after their stay at the marina. Even if Lotterer built the areas before Grubbs' arrival, the jury was entitled to infer that Grubbs—who spent a significant amount of time with Lotterer on the *Maxima*—had knowledge of what was afoot. The government also introduced into evidence fourteen business cards of the Isletta Marina found on appellant Withey, establishing that he had at least some connection with the marina.

All three appellants were on the *Maxima* when it made its October, 1983 trip to the U.S. Naval Base in Guantanamo Bay, Cuba shortly before its voyage north. This trip provided an easy opportunity for the trio to travel to Jamaica and pick up the marijuana, and the jury could reasonably infer that they did so. Jamaica is 150 miles from Cuba. The marijuana found on board the *Maxima* was not only Jamaican (which could presumably be grown in other places) but also had a Jamaican dollar bill attached to each bale. There is no dispute that all three appellants were on the *Maxima* during this period and each would have known about any trip to Jamaica to pick up the valuable cargo.

We also note that the jury was entitled to give weight to the circumstances surrounding appellants' apprehension and arrest. Appellants were discovered in the middle of the night, at 3:30 a.m., approaching a coastline whose irregular features provide a tempting target for smugglers seeking to unload their wares undetected. Appellants' boat was equipped with the sophisticated navigational equipment and charts necessary to ensure that they would reach their intended haven, a site that charts showed to be far from the stated destination. Though appellants were allegedly coming to Charleston for repairs to a cracked hull, they could not identify the yard that was to do the work. Reasonable inferences from the secret and deceptive circumstances attending appellants' approach to shore provide further support for the jury's verdict.

Taken as a whole, the evidence in this case is clearly sufficient to allow the jury to infer that each defendant had knowledge of the void areas on the ship and the bales of marijuana that eventually filled those areas, and, further, that the relationship among the appellants was such that their knowledge of and participation in a conspiracy is sufficiently supported, as were the convictions for the substantive offenses.

Appellants' invocation of *United States v. Willis,* 639 F.2d 1335 (5th Cir.1981) is unavailing. In *Willis,* the court reversed the conviction of two crew members where, as here, the contraband was in a closed fishhold, no odor was detectable, and neither defendant had access to the hold. The

government had presented no evidence to show knowledge of and participation in the conspiracy. Given the other evidence here, appellants would in effect extend *Willis* to hold that knowledge of unlawful activity cannot, as a matter of law, be inferred where contraband is well-secreted.

The mere fact that a cargo is ingeniously concealed will not preclude a jury from finding unlawful importation. A jury could regard the location of the marijuana as evidence either of the ignorance of defendants or of the extraordinary lengths they took to conceal their illegal cargo from authorities. Here the jury found knowledge rather than ignorance. To overturn its verdict would place an unwarranted premium on the inconspicuous smuggling of illegal substances.

### B.

■ Appellants challenge their convictions for conspiracy to possess with intent to distribute marijuana and for the underlying offense on the grounds that the government failed to introduce sufficient evidence of intent to distribute. This court recently upheld a similar claim in *United States v. Manbeck*, 744 F.2d 360 (4th Cir.1984), *cert. denied sub nom.; O'Hare v. United States*, —— U.S. ——, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985), and appellants rely on *Manbeck* in urging reversal here.

In *Manbeck*, appellants unloaded nearly 30 tons of marijuana from their boats, transferring it to land-based defendants and onto waiting trucks. The court reversed the conviction of the sea-based defendants for conspiracy to possess marijuana with intent to distribute because the lower court had impermissibly allowed intent to distribute to be inferred "solely ... from the fact that a large quantity of marijuana was imported." *Id.*, 744 F.2d at 388. *Manbeck* required further evidence that sea-based defendants had the intent to distribute as well as import before a conviction on the former count could be sustained.

■ Here that additional evidence is present. In *Manbeck*, defendants off-loaded the marijuana to others who were hauling it away in trucks when they were apprehended. Here, by contrast, no off-load operations were discovered in the vicinity of St. Helena's Sound. No other vessels were discovered in the vicinity of the *Maxima* either. Where the only members of a conspiracy in the area are those who actually imported the substance, the inference of intent to distribute is acceptable.

*Manbeck* is not to the contrary. It recognized that "the large quantity [of marijuana] indicates that someone planned to distribute it." *Id.*, 744 F.2d at 390. The elusive "someone," however, could not be said to be the sea-based defendants who had abandoned control of the contraband, had left the scene, and had off-loaded the substance to others who were undertaking actual distribution themselves. Where, however, no other persons who would undertake distribution are in evidence, the finger points more directly toward defendants as the "someone" to perform that job. Certainly the jury was entitled to conclude that defendants would not import 1½ million dollars of marijuana and simply abandon it.

Other evidence also supports an inference of intent to distribute. There was specific evidence that Lotterer and Grubbs intended to remain in the United States for some time after their arrival on the shores of South Carolina with 86 bales of marijuana, and Withey's alleged plans to return to the Carribean by plane required at least some time on the mainland. In *Manbeck*, by contrast, the sea-based defendants were already back offshore when they were apprehended. An inference that the time to be spent in the United States—in Lotterer's case about six weeks—was in part for the purpose of distributing their cargo is entirely reasonable. Finally, there is evidence that the appellants had information that would help them in peddling the marijuana while they were in the country. A November, 1983 copy of *High Times* found in the berth of the ship contained an article on sensimilla and a price chart showing the current street value of Jamaican sensimilla,

and other drugs. Such information would certainly assist appellants in the sale and pricing of their cargo, and a jury could reasonably infer that they intended to use the information in that way. We thus find the evidence sufficient to support the view that appellants intended to distribute what they had imported.*

### III

Appellants allege further errors concerning the admission and exclusion of certain evidence and the propriety of the second search of the *Maxima*. We have reviewed the remaining assignments of error in this case and find them to be without merit. The convictions of appellants are accordingly

AFFIRMED.

TURK, Chief Judge, concurring in part and dissenting in part:

I can find no evidence anywhere in the record to support Withey's convictions for conspiracy to possess and for possession of marijuana with intent to distribute. For this reason, I respectfully dissent from that portion of the opinion.

Despite an extensive record, the government adduced no evidence supporting the inference that Withey was even aware of a distribution scheme. His involvement in the importation of marijuana does not necessarily implicate him in its distribution, or in any plan with that end. *See U.S. v. Manbeck*, 744 F.2d 360, 388 (4th Cir.1984). This court recognized in *Manbeck* that an

intent to distribute cannot be inferred on the part of a crew member from his participation in the importation of marijuana.

Assuming that joining a conspiracy to import is distinct from joining a conspiracy to distribute, and assuming that in any given case a defendant may have conspired to participate in one or the other or both, the quantity of marijuana smuggled provides no basis for identifying which of the foregoing conspiracies were joined unless it is presumed that one who conspires to import a large quantity of marijuana also conspires to distribute it.

*Id.* at 389–90. The *Manbeck* court rejected such a presumption, and the majority here implicitly agrees provided the importers have no plans to deliver their illegal cargo for distribution by others.

The fault lies in permitting the inference against Withey. Unless the court is prepared to eschew as essential elements of conspiracy a defendant's awareness of the conspiracy's existence and his willful participation in it, an intent to distribute cannot be inferred simply from Withey's role in the importation and the absence of anyone waiting, so far as was known, to receive the marijuana. A late replacement for Lotterer's girlfriend, he was linked to the importation scheme by circumstantial evidence barely sufficient to support a conviction. The record is void of any evidence of his knowledge of a further conspiracy to distribute, much less his intent to participate in such a venture. Nothing in the

---

* The dissent notwithstanding, the jury was entitled to find defendant Withey guilty of the distribution offenses. His alleged plans to return to the Carribean were supported by nothing but the assertion of his witness; no airline tickets or reservations were shown. The jury was entitled to view this testimony—from Withey's fiancee—with skepticism. Even if definite plans to return existed, these would not prevent Withey from participating in a conspiracy or in actual distribution during time spent on the mainland.

Moreover, the jury was not required to believe Withey anything other than an "insider" in this enterprise. Immediately prior to the voyage to Charleston, the *Maxima*, with all three defendants on board, sailed on a two week voyage to Guantanamo Bay, Cuba and back to the Virgin

Islands. Defendant Withey also was found in possession of fourteen business cards from the Isletta Marina, where Grubbs and Lotterer rendezvoused in July, 1983.

Withey was intimately associated with the entire venture. He was a member of a small three-man crew on an extended voyage, where the jury could infer that information was a common currency and that plans were jointly held. The dissent concedes the sufficiency of the evidence to support Withey's conviction on the importation offenses, and the involvement of his crewmates in distribution as well. In view of the intimacy of his involvement, to quarantine Withey from his co-defendants on the distribution convictions is unwarranted.

record indicates Withey knew what would happen to the marijuana once the *Maxima* reached the United States. Although Lotterer and Grubbs were intending to remain in the U.S. for some time—not so as to Withey. His plans were to return to the Carribean by plane. From this absence of proof, the only possible inference is in Withey's favor. Although the rule as stated by the majority might appear sound on its face, it is not so in its application to Withey.

I would reverse Withey's convictions for conspiracy to possess and for possession with intent to distribute. I concur with the majority in affirming Withey's other convictions and those of his co-defendants.