UNITED STATES of America, Plaintiff–Appellee,

v.

Brian Keith MILLS, Defendant–Appellant. (Two Cases).

UNITED STATES of America, Plaintiff–Appellee,

v.

Benjamin Ronald SCALES, Defendant–Appellant.

Nos. 92–5231, 92–5287 and 92–5491.

United States Court of Appeals, Fourth Circuit.

Argued March 4, 1993.
Decided May 28, 1993.

Anthony Wayne Harrison, Sr., Hugh Davis North, III, Harrison, North, Cooke & Landreth, Greensboro, NC, argued for plaintiff-appellant Scales.

Michael Andrew Grace, Greeson, Grace & Gatto, P.A., Winston–Salem, NC, argued (Lisa S. Costner, on brief), for plaintiff-appellant Mills.

David Bernard Smith, Asst. U.S. Attorney/Senior Litigation Counsel, Greensboro, NC, argued (Robert H. Edmunds, Jr., U.S. Atty., on brief), for plaintiff-appellee.

Before HALL, Circuit Judge, BUTZNER, Senior Circuit Judge, and POTTER, United States District Judge for the Western District of North Carolina, sitting by designation.

## OPINION

POTTER, District Judge:

The Defendant–Appellant contends that the District Court erred:

1. In denying Appellant Scales' motion for judgment of acquittal on count one.

2. By refusing to provide Appellant Scales with a jury instruction concerning multiple conspiracies and the buyer-seller defense.

3. By admitting evidence of Mills' past drug transactions.

4. In denying Mills' motion to dismiss an indictment founded on testimony before the grand jury which misidentified another co-conspirator as Mills.

5. In computing Appellants' foreseeable quantities of drugs and in refusing to give them credit as minor participants.

This case results from a charge of a violation of 21 U.S.C. § 846. We affirm.

## FACTS

This case arises out of a conspiracy to distribute multiple kilograms of cocaine headed by Samüel Manko, a citizen of Ghana, during the spring and summer of 1988 through early 1989.

### A. Appellant Scales

Benjamin Scales first met Manko in the spring or summer of 1988 when a co-conspirator, Hayward "Mookie" Hicks, introduced the two men. Scales' first meeting with Manko was inaugurated by Scales' four ounce purchase of cocaine from Manko. Sometime after this transaction, Manko returned to his base of operation in Miami, Florida. Soon the conspiracy began to unfold when Scales summoned Manko back to North Carolina. In August of 1988, Scales called Manko in Miami inquiring when he would return to town and Manko replied he was ready to do so because he wanted to do some "business." Eventually, Scales provided Manko an escort, Jackie Suffern, who flew to Miami to deliver to Manko $5,000 of Mookie Hicks' money, and drive Manko to Raleigh, N.C. Manko and Suffern returned to Raleigh, N.C. with four kilograms of cocaine which were sold out of a hotel room which Scales rented. Scales sold nine ounces of the four kilograms brought by Manko from Miami. During the course of the conspiracy, Manko and Suffern traveled together on several occasions to purchase or deliver cocaine.

There was testimony concerning Scales' multiple purchases and sales of cocaine in quantities ranging from two to twelve ounces. There was also testimony that Manko kept cocaine at Scales' house during the course of the conspiracy.

## B. *Appellant Mills*

Brian Mills was introduced to Manko in Raleigh during the summer of 1988 as a prize customer/distributor—someone who wanted to buy ten kilograms of cocaine weekly from Manko. Mills eventually participated in a joint purchase with Glen Marks of four kilograms of cocaine from Manko. That four kilogram quantity of cocaine was delivered to Mills and his associates in the purchase at an auto-repair shop in Reidsville, N.C.

Co-conspirator Reginald Gaddy testified he purchased cocaine from Mills prior to the period covered by the conspiracy beginning in 1985. Gene Burns, a co-conspirator, testified he bought cocaine from Mills during the summer of 1988 which includes the conspiracy period. There was also testimony that Mills assisted Marks in an eight to ten ounce sale of cocaine in Raleigh, N.C. Later in 1989, Mills sought to buy three kilograms, but actually purchased one kilogram less nine ounces, and was told by Manko, "if they needed more cocaine, they could follow him back to Florida and he could purchase any amount...." (App. 389–90). There was other testimony that Mills was either a participant in or facilitated (i.e. he carried cocaine to a co-conspirator's car after a sale) conspiracy-related drug transactions.

During trial, cross examination of DEA Agent John Ingram by Mills' counsel uncovered an odd predicament presented by the Grand Jury's indictment of Mills. Agent Ingram testified at trial for the first time that his testimony before the Grand Jury concerning Mills' involvement in the conspiracy was factually mistaken. Agent Ingram admitted at trial that he wrongly told the Grand Jury of a co-conspirator called "Brincefield" but inadvertently called him by Mills' name. Just before resting his case, Mills moved to dismiss the indictment and renewed that motion after the jury delivered

its guilty verdict. The district court denied both motions.

Simply put, Agent Ingram unintentionally confused "Brincefield" with Mills in his Grand Jury testimony. Accordingly, the Grand Jury heard testimony about a man called Brian Mills who was involved in the conspiracy, but did so through an account of conduct which actually related to a man named "Brincefield." Ultimately, the Grand Jury indicted Mills on the testimony of Agent Ingram. There was no claim at trial that either the Government or Agent Ingram maliciously misled the Grand Jury.

## DISCUSSION

### I.

Appellant Scales' first complaint is that the trial court wrongly denied his Fed. R.Crim.P. 29 motion for judgment of acquittal. We review judgments of acquittal by asking, "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The essential elements of the instant conspiracy are 1) an agreement between two or more persons, tacit or express, to undertake to violate 21 U.S.C. § 841; 2) the accused willfully joined the conspiracy; 3) with intent to accomplish the criminal purpose of the conspiracy. *United States v. Clark*, 928 F.2d 639, 641–642 (4th Cir.1991); *United States v. Bell*, 954 F.2d 232, 237–238 (4th Cir.1992).

Appellant Scales is concerned that his conviction presents another woeful instance of the "increasing abuses of the conspiracy concept occasioned by ever growing governmental efforts in the 'war against drugs.'" Brief for Appellant at 12. While it is true that this Court has expressed concerns over abuses of the "elastic" law of conspiracy to ensnare the innocent, we have never held that conspiracy prosecutions are inherently or presumptively suspect and find no abuse in the instant case. *Id.* at 237. Our concern with conspiracy law was well put in *Bell* when we voiced our "significant reluctance to

apply conspiracy [law] to individuals whose most heinous ... crime is choosing the wrong friends." *Id.* Simply said, we are not concerned about conspiracy convictions within the law. We are only troubled by conspiracy convictions which reach beyond the rightful bounds of the criminal prohibitions of our law. It is unlawful to prosecute someone for having unseemly associates. It is not improper to hold someone liable for violating the conspiracy laws. A drug conspiracy conviction simply is not presumed suspect by virtue of its being drug or conspiracy related.

■ We think the district court did not err in denying Appellant's motion for judgment of acquittal. We must review such denials by drawing "all reasonable inferences in favor of the government." *United States v. Laughman,* 618 F.2d 1067, 1077 (4th Cir. 1980). In the light most favorable to the government, it appears to us that Scales did in fact agree with Manko to peddle cocaine when he purchased cocaine from Manko, arranged to have Manko brought to North Carolina with cocaine and stored Manko's cocaine in his house. We further believe Scales joined this conspiracy willfully when he contacted Manko personally to inquire when he would return to North Carolina and then arranged for him to come to Raleigh. Finally, we find the evidence against Scales adequately supported a finding that he intended to further the criminal objectives of the alleged conspiracy since it plainly indicates he understood Manko's "business" entailed cocaine distribution. We believe Scales did not merely choose the wrong friends, he chose to enter the wrong business with the wrong business partners.

Scales urges us to overturn his conviction since he was charged with a multiple kilogram conspiracy and yet the government failed to prove he even so much as "discussed ... the *existence* of the 'multiple kilogram' conspiracy with which he was charged...." Brief for Appellant at 17 (emphasis in original). Apparently, Scales would have us hold that before one can be held to answer for a conspiracy charge which alleges an agreement to distribute multiple kilograms of cocaine, there must be evidence that the conspirators agreed upon the quantity of drugs that they intended to jointly sell. That is, there must not be one conspirator who intends to sell five kilograms and one who only intends to sell one kilogram. They must both intend to sell five kilograms or one but not both. We decline to make such a fanciful holding.

■ Instead, we reiterate that the focus of a conspiracy charge is the agreement to violate the law, not whether the conspirators have worked out the details of their confederated criminal undertakings. To violate 21 U.S.C. § 846, there need only be proof the conspirators agreed to jointly undertake prohibited conduct, not to do so with a specific drug amount in mind. "The gist or gravamen of the crime of conspiracy is an *agreement* to effectuate a criminal act." 618 F.2d at 1074. The emphasis of conspiracy law is upon the act, the agreement to violate the law, not the drug amount. Accordingly, we believe the district court properly denied Scales' motion for judgment of acquittal and that his conviction must stand.

## II.

Scales' second assignment of error concerns his claim that the trial court unlawfully denied his request for instructions concerning multiple conspiracies and the buyer-seller defense. Scales relies upon our decision in *United States v. Giunta,* 925 F.2d 758, 767 (4th Cir.1991), and the Seventh Circuit holding in *United States v. Townsend,* 924 F.2d 1385, 1394 (7th Cir.1991).

Scales reliance upon *Giunta* is unfounded since the facts of that case are distinguishable from the facts of the instant case. The *Giunta* holding concerned a situation where one acts as a sort of placement agent for a drug distributor. There, we held that one does not come within the 21 U.S.C. § 846 conspiracy prohibition of conspiring to possess with intent to distribute controlled substances by merely facilitating a sale. At most, such conduct would amount to aiding and abetting possession with intent to distribute. The facts in this case do not implicate the seller-facilitator relationship. Therefore, *Giunta* is inapposite.

Similarly, this case is factually distinguishable from *Townsend*. *Townsend*, unlike *Giunta*, contemplates a situation where the evidence shows one is merely a buyer or seller in a drug transaction and takes the view that such evidence, standing by itself, is insufficient to make out a conspiracy.[1] We take it for granted that there may be instances where one is merely a buyer or seller, but not a conspirator. However, the facts of this case demonstrate Scales was far more than a mere buyer.

We have said the critical inquiry in a conspiracy case concerns whether the Government proved "agreement between at least two persons to concerted action." *Giunta*, 925 F.2d at 764. In the present case, we are satisfied that the evidence was sufficient to prove Scales conspired to distribute cocaine. The evidence was that Scales not only bought and sold cocaine, but that he also assisted Manko in both housing cocaine and in traveling to North Carolina to sell cocaine. We believe that evidence is sufficient to permit a jury inference that Scales shared a common conspiratorial purpose. Since the existence of an illicit agreement is the essential question, we do not believe the trial court's refusal to deliver a buyer-seller defense instruction was clearly erroneous because the facts showed that the relationship went beyond that of a mere buy-sell transaction.

As to Scales' complaint that he was entitled to an instruction on multiple conspiracies, we take a similar view. A court need only instruct on multiple conspiracies if such an instruction is supported by the facts. "If the facts support only a single conspiracy, the jury need not be instructed about multiple conspiracies." *United States v. Crockett*, 813 F.2d 1310, 1316 (4th Cir.1987). We do not believe the trial court's refusal to instruct on multiple conspiracies was clearly erroneous.

## III.

Appellant Mills argues the trial court erred in admitting evidence of his past drug dealings outside the scope of the conspiracy covered by the indictment. We disagree. We review a trial court decision to admit evidence of other crimes under Fed. R.Evid. 404(b) by an abuse of discretion standard. *United States v. Mark*, 943 F.2d 444, 447 (4th Cir.1991). Under the 404(b) standard, we have held that proof of prior bad acts may be admitted into evidence when they are "(1) relevant to an issue other than character, (2) necessary, and (3) reliable." *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir.1988).

The evidence about which Mills objects related to his past drug dealings with other co-conspirators. We think the trial court was properly within its discretionary authority in finding this evidence was unrelated to Mills' character. It could well have been offered to establish his intent. Similarly, evidence of past drug transactions is relevant to Mills' knowledge of the drug trade and permitted an inference that he knew the nature of his acts. Finally, the trial court was within the range of its discretion in finding this evidence was reliable since it came from a co-conspirator who was, by his testimony, making a statement against his interest by admitting his own involvement in the past drug dealings. Finally, we do not believe this evidence was so prejudicial as to implicate Fed.R.Evid. 403 concerns. We find no error in the trial court's decision to admit this testimony of Mills' prior bad acts.

## IV.

Mills also claims the trial court's denial of his motion to dismiss the indictment was error. 792 F.Supp. 444. Mills finds

---

**1.** *Townsend* seems to go a step further by adding that, "The buy-sell transaction is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." *Townsend*, 924 F.2d at 1394. Furthermore, *Townsend* seems to take the view that "The mere purchase or sale of drugs (even in large quantities) does not demonstrate an agreement to join a drug distribution conspiracy." *Id*. We decline to go this far. In our view, evidence of a buy-sell transaction is at least relevant (i.e. probative) on the issue of whether a conspiratorial relationship exists. Moreover, we believe evidence of a buy-sell transaction, when coupled with a substantial quantity of drugs, would support a reasonable inference that the parties were coconspirators.

error in the indictment itself, which was supported by no evidence of *his* criminal conduct. Accordingly, he claims he was deprived of his Fifth Amendment rights to due process and grand jury indictment because he was indicted for the conduct of another (Brincefield) who was mistakenly referred to by Agent Ingram as Mills. We disagree. We review indictments for constitutional error and prosecutorial misconduct. *United States v. Schmidt,* 935 F.2d 1440 (4th Cir. 1991).

■ Because we believe the due process to which Mills was entitled in the instant matter is only that process afforded him by the Fifth Amendment's Indictment Clause, we confine ourselves to reviewing his claim under the standards of the Fifth Amendment indictment right. Moreover, since Mills admits he was in fact indicted—indeed, the wrong about which he complains is an indictment—we find the procedural aspects of the Fifth Amendment Indictment Clause have been completely satisfied here. The Fifth Amendment to the Constitution provides, "No person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a Grand Jury. . . ." U.S. Const. amend. V.

The father of our grand jury system is the aged institution of the English grand jury established in the year 1166, which was embodied in Magna Carta and adopted into our fundamental law, the Constitution. By the 17th century, the grand jury developed into an institution which accomplished investigative, accusative, and protective functions. As early as 1625, the institution of the Grand Jury found its way into the law of the American colonies in Virginia and retained its essential common law characteristics when the drafters of the Bill of Rights provided for it in the Fifth Amendment. Simply stated, "[t]here is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor." *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956).

The Fifth Amendment right to grand jury indictment is an omnibus right conceived to further subsidiary procedural and substantive interests which shield the innocent from wrongful convictions. Our Constitution is a majestic document, in part, because it was designed to shelter the rights of Americans through a layered structure of procedural rights which often provide duplicative protection of identical interests. For example, the Sixth Amendment jury trial right and the Fifth Amendment indictment right both procedurally further a common subsidiary liberty interest in freedom from baseless prosecution. Similarly, the First Amendment rights of freedom of speech and the press each shield citizens' fundamental right to speak their minds without undue government interference.

The right to indictment guards persons from wrongful prosecution by an overbearing state where they are either falsely accused of, or are being held to answer twice for the same crime. *United States v. Williams,* —— U.S. ——, ——, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352 (1992) (constitutional history reveals it is axiomatic that constitutional role of grand juries is to assess whether there is an adequate basis for bringing criminal charges); *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974) (grand jury historically protects citizens against unfounded criminal prosecutions). The right to indictment also provides persons rightfully suspected of crimes with formal notice of the accusations against them, and an opportunity to prepare to meet those charges. It further limits juries to trying felony defendants for only those charges in an indictment. The right to a grand jury indictment stands as "a buffer or referee between the Government and the people" but is not the only constitutional right which guards all the interests it protects. *Williams,* —— U.S. at ——, 112 S.Ct. at 1742.

The interests protected by the Fifth Amendment Indictment Clause are defined by the limits of Grand Jury authority. That is, the Fifth Amendment's right to indictment protects the interests of the innocent in freedom from trials on utterly baseless criminal charges and in an independent, impartial review of the facts supporting criminal

charges.[2] Thus, the Indictment Clause insulates the innocent from the ordeal of a criminal trial and does so, in part, by ensuring that grand juries are free of the sort of bias, such as racial discrimination, which produces fatuous indictments. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 257, 108 S.Ct. 2369, 2375, 101 L.Ed.2d 228 (1988).

The longstanding rule of law that courts may not "look behind" grand jury indictments if "returned by a legally constituted and unbiased grand jury ..." is the touchstone for any inquiry into the legality of indictments. *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). The *Costello* Court was urged, but declined to hold, that defendants may "challenge indictments on the ground that they are not supported by adequate or competent evidence." *Id.,* 350 U.S. at 364, 76 S.Ct. at 409. Thus, the Fifth Amendment requires only that, "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charges on the merits." The Supreme Court has clearly indicated its unwillingness to second guess the decision of a grand jury to formally accuse an individual brought before it based upon some incriminating evidence.

Furthermore, the Supreme Court has held that courts "as a general matter ... may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia,* 487 U.S. at 254, 108 S.Ct. at 2373. For errors of non-constitutional magnitude, "a federal court may not invoke supervisory power to [dismiss an indictment and] circumvent the harmless-error inquiry prescribed [by Fed.R.Crim.P. 52(a)]." *Id.* In such cases, courts must only dismiss indictments if prejudicial error has been created by the procedural defect.

Therefore, the Supreme Court's holdings under the Fifth Amendment's Indictment Clause teach that courts lack authority to review either the competency or sufficiency of evidence which forms the basis of an indictment and may not quash indictments when the errors which produce them, such as prosecutorial misconduct or violation of a statute, do not affect substantial rights. *Nova Scotia,* 487 U.S. 250, 108 S.Ct. 2369 (1988); *United States v. Mechanik,* 475 U.S. 66, 70, 106 S.Ct. 938, 941, 89 L.Ed.2d 50 (1986); *Costello,* 350 U.S. 359, 76 S.Ct. 406 (1956). The *Costello* holding prohibits courts from reviewing the substance of evidence which produces an indictment, and the *Nova Scotia* ruling prevents dismissal of an indictment tainted by procedural defects which only amount to harmless error. The *Mechanik* decision, while instructive, is not controlling since that Court held a "petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation [of Fed. R.Crim.P. 6(d)]." *Mechanik,* 475 U.S. at 73, 106 S.Ct. at 943. Thus, the *Mechanik* Court decided the case on statutory grounds and never reached the constitutional aspects of the grand jury indictment right.

Neither line of authority directly addresses the issue presented to this Court since what is objected to here is not that the evidence was presented, and yet too thin, or that the indictment was tainted by some procedural impropriety. Of course, Mills cannot claim he was not indicted at all since he plainly was. Instead, Mills objects that there was no evidence to support the indictment. He does not ask us to look behind the indictment, but instead claims a head-on look at the indictment reveals it is empty. Thus, the problem presented by this case is that so aptly foreseen by Mr. Justice Burton in his *Costello* concurrence. There, Justice Burton proposed that, "if it is shown that the grand jury had before it no substantial or rationally

**2.** Of course, it is not the case that those who have been acquitted before a petit jury in a case such as this have been denied their substantive right to indictment under the Fifth Amendment. The Grand Jury referred to by the Fifth Amendment is not charged with deciding guilt or innocence which in our law requires factual findings beyond a reasonable doubt. Instead, the Grand Jury is commissioned only with examining whether there is probable cause to believe an accused person committed a crime. A Grand Jury's decision on whether probable cause exists prior to a petit jury's hearing provides the best possible substantive barrier to an unfounded prosecution. But, the grand jury does not provide the only barrier.

persuasive evidence upon which to base its indictment, that indictment should be quashed." *Costello*, 350 U.S. at 364, 76 S.Ct. at 409 (Mr. Justice Burton concurring). However, we have already observed that "Justice Burton's view ... has never commanded another vote in the Supreme Court, and fails to overcome the clear command of the majority in *Costello*...." *United States v. Alexander*, 789 F.2d 1046, 1048 (4th Cir. 1986).[3] Furthermore, for reasons stated *infra*, we decline to adopt the solution offered by Justice Burton to the problem at hand.

As noted *supra*, not all dimensions of the rights furthered by the Indictment Clause are presented to the Court by the instant appeal. Mills did not raise below, and has not stated on appeal, that the Grand Jury was itself somehow rendered defective by illicit motives or unfair biases. We find no basis for concluding the grand jury in this case was motivated by impermissible impulses in its decision to indict.

Mills does not argue that the Government intentionally engaged in misconduct, that it deliberately misinformed the grand jury, or that any procedural rule was violated. We are persuaded the Government did not intentionally abuse the grand jury system. Therefore, no prosecutorial misconduct is presented by this appeal.

Mills does not assert that the evidence, on its face, was insufficiently persuasive for a grand jury finding of probable cause to indict the person whom the grand jury, in good faith, believed was the true Brian Mills. Furthermore, Mills does not complain that the indictment subjected him to double jeopardy nor does he object to the indictment's form on appeal.

Mills was indicted for conspiracy and for seven substantive counts. The district court dismissed six of the substantive counts. The jury acquitted him of the remaining count and convicted him only on the conspiracy count. There was no variance between the count charging the conspiracy and the evidence that the government introduced proving that Mills was a member of the conspiracy. Therefore, Mills cannot claim he was tried without the benefits of an indictment or that there was a variance between the indictment and the evidence at trial since, of course, he was brought to trial on an indictment with corresponding evidence for which the jury convicted him on one count and acquitted him on another. Accordingly, Mills does not object that he lacked formal notice of the charges leveled against him or that a jury convicted him of something for which he was never charged. Therefore, Mills does not claim his indictment was facially invalid.

Mills does not protest that he is not guilty of the indictment charge and therefore does not challenge the petit jury decision to convict him as being founded upon inadequate evidence or legal defect. We are confident that the evidence at trial was adequate, in the light most favorable to the Government, to permit a jury verdict of guilty beyond a reasonable doubt.

Consequently, the only remaining interest protected by the Indictment Clause which Mills can claim he did not enjoy is the interest of those who have committed no crime in avoiding wrongful prosecution. Essentially then, this Court must decide whether, given that Mills was indicted and afforded nearly all the subsidiary interests protected by the indictment right, he was still deprived of his Indictment Clause rights sufficient to mandate a dismissal.

To find a reversible error here, this Court would have to conclude the grand jury could not have found probable cause to indict a man on evidence which convinced a petit jury, beyond a reasonable doubt, to convict. This, we decline to do. We are unconvinced that Mills was deprived of his interest in freedom from unfounded prosecution by the instant indictment. Therefore, since Mills admits the bulk of his indictment right inter-

---

**3.** In *Alexander*, we were presented with a claim that "a government criminal investigator, presented unsubstantiated and hearsay testimony to the grand jury, and that, in any case, the evidence before the grand jury was not sufficiently specific as to support the allegations of the in-

dictment." *Alexander*, 789 F.2d at 1048. *Alexander* is distinguishable from this case since in *Alexander* the indictment was challenged on the sufficiency of evidence, not, as here, an entire lack of evidence.

ests were actually protected by the Grand Jury, and since in fact all of those rights were protected either by the trial court or the petit jury, we conclude Mills was supplied his right to indictment within the meaning of the Fifth Amendment. Furthermore, we find the trial court acted within its discretion, based on the evidence before it at the time, by permitting the indictment to go to the jury.

■ We hold that where a trial has begun and a court is presented with a facially valid indictment founded entirely upon mistaken evidence, and where the indictment is clouded by no sign of intentional Government impropriety, the trial court must ask itself whether, based upon the evidence presented to the court, a grand jury could have reasonably found probable cause to indict. This standard is similar to that undertaken in a Fed.R.Crim.P. 29 motion for judgment of acquittal. The court must first determine whether there is a variance between the indictment and the evidence; that is, whether the defendant was informed of the charges against him. If there is no variance, the court must view the evidence in the light most favorable to the Government and ask whether a grand jury could rationally have found probable cause to formally accuse the defendant. The trial court must ask whether the grand jury would have rationally chosen to indict on the properly presented evidence. If no rational grand jury could have found probable cause to indict, the indictment must be dismissed.

When viewed after a petit jury guilty verdict, all doubt vanishes about whether a reasonable grand jury could find probable cause that a crime was committed. Likewise, all doubt disappears concerning whether a prosecution was wrongfully instituted since a petit jury finding of guilt beyond a reasonable doubt to convict is a more stringent standard than a grand jury's finding of probable cause to indict. The conviction assures us as much as our system can that an innocent person was not brought to trial and that the right against wrongful prosecution protected by

the Indictment Clause was not invaded. As the *Costello* Court observed, "[i]n a trial on the merits, defendants are entitled to a strict observation of all the rules designed to bring about fair verdicts." *Costello*, 350 U.S. at 364, 76 S.Ct. at 409. Having received those rights and lost, a defendant can hardly be heard to complain that he is the innocent victim of a grand jury gone mad.

However, prior to submitting the case to the petit jury, the inquiry is admittedly less certain, but by no means unmanageable. When reviewing the evidence prior to a verdict, the court need not decide with certainty whether the accused is guilty or innocent. The court need only concern itself with whether a reasonable grand jury could have concluded a crime had been committed by the accused based on the evidence before it. Certainty is not the standard, only probable cause must be findable by a reasonable set of grand jurors.

■ We are unconvinced that, since one institution did not furnish Mills with the complete enjoyment of a subsidiary right, the right went unprotected or that a dismissal of the indictment is merited. It simply does not follow that because one interest protected by a grand jury was not fully vindicated, that the subsidiary interest either went unrealized or that the entire right was deprived. Mills, in fact, was not deprived of his interest in avoiding illicit prosecution or conviction since those rights were fully vindicated either by the court or the petit jury which voted to convict him.[4] Those subsidiary interests were entirely protected, albeit by an institution other than the grand jury. Mills has directed us to no case, and we know of no rule, which compels the conclusion that the Constitution has been violated where a right went unprotected by one institution, and yet was fully protected by another.

We see little use in dismissing an indictment and overturning a conviction to vindicate a right against wrongful prosecution which a guilty verdict tells us has hardly been trammeled. To do so might allow one convicted felon to boast to another, "Well, at

---

**4.** The right against unfounded conviction is optimally protected by two rights, the right to indictment and to a jury trial, and by two institutions,

the grand jury and the petit jury. In this case, the right against unfounded conviction was fully protected by the petit jury.

least I was indicted on the right evidence!" but would vindicate little else, would tell us nothing about the guilt or innocence of the felon, and plainly "add nothing to the assurance of a fair trial." *Id.*

### V.

 Finally, both appellants claim the trial court erred in sentencing them by wrongly computing their foreseeable quantities of drugs and by refusing to give them credit as minor participants. We review factual findings regarding drug amounts and the degree of participation in conspiracies under a clearly erroneous standard. *United States v. Vinson,* 886 F.2d 740 (4th Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990); *United States v. Daughtrey,* 874 F.2d 213 (4th Cir.1989). Based upon our review of the record, we find no basis for concluding the district court's findings of fact were clearly erroneous. Therefore, we uphold the Appellants' convictions and sentences.

To summarize, we affirm the district court entirely.

*AFFIRMED.*

HALL, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the judgment of the majority, and I join all of its opinion except Part IV. I would hold simply that a district court may not quash a facially valid indictment based solely on the insufficiency or incompetence of the evidence presented to the grand jury. I think that *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), unambiguously so holds. We should, and can, step in to remedy constitutional defects in or prosecutorial abuse of the grand jury process, but the criminal trial and the petit jury are our system's checks on groundless indictments, and I do not believe that the Constitution requires or permits a district court to act as an intermediate stratum of review.